### WEST v. WOODRUFF.

(Supreme Court, Appellate Division, Third Department. March 7, 1906.)

1. APPEAL.—DIRECTED VERDICT.
   On appeal from a directed verdict, the appellant is entitled to the most favorable inference deducible from the evidence, and all disputed facts are to be treated as established in his favor.

   [Ed. Note.—For cases in point, see vol. 3, Cent. Dig. Appeal and Error, § 3748.]

2. HIGHWAYS—PERSONAL INJURIES—RUNAWAY HORSE—EVIDENCE—QUESTION FOR JURY.
   In an action for personal injuries from being struck by a runaway horse, which it was alleged defendant negligently attempted to keep in the immediate vicinity of a moving train, evidence *held* to require submission to the jury of the issue of defendant's negligence.

Appeal from Trial Term, Livingston County.

Action by Frank G. West against Henry G. Woodruff. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Argued before PARKER, P. J., and SMITH, CHESTER, KELLOGG, and COCHRANE, JJ.

Charles D. Newton, for appellant.
George D. Reed, for respondent.

JOHN M. KELLOGG, J. "In disposing of this case it is to be borne in mind that this is a directed verdict, and the appellant is not only entitled to the most favorable inference deducible from the evidence, but all the disputed facts are to be treated as establishd in her [his] favor." Koehler v. New York Steam Co., 183 N. Y. 1, 75 N. E. 538. It is not claimed that the plaintiff suffered his injury by reason of defendant's driving a vicious horse, as was claimed in Benoit v. Troy & Lansingburgh R. R. Co., 154 N. Y. 223, 48 N. E. 524; but the defendant is himself accused of personal negligence. The injury is alleged to have arisen, not from the vice of the horse, but the negligence of the driver. The defendant himself, and not the horse, is therefore on trial.

The complaint alleges, in substance, among other things, that defendant, knowing his horse was nervous, high-spirited, an unaccustomed to the cars, negligently drove it upon an embankment within a few feet of a moving train, and negligently attempted to maintain it there while the train was passing, and that after he saw the horse was restless and frightened, and when it was rearing and plunging, he negligently managed the horse, did not attempt to get it away from the danger, but attempted to make it stand within a few feet of the engine, which was passing and blowing off steam and making a great noise, and that solely by reason of the negligence of the defendant his wagon was overturned, and the horse ran away and over the plaintiff and injured him. The animal was valuable, 15 years old, gentle, of good life, and had never run away before. The defendant had the right to drive it, and he is without criticism for so doing. It is only claimed that, knowing the place and the horse, and the dangers to be apprehended, he did not act as a prudent man would act under the circumstances. The character

of the horse is alleged, not as a ground for recovery, but as one circumstance, among others, tending to show that the defendant was negligent. If he placed a known, nervous, high-spirited horse in an unusual and strange place, where it would become frightened, and upon a narrow road on an embankment, a place where there would be difficulty in handling a frightened horse, all of those facts would be proper for consideration in determining whether he acted with due care; and, if they do not indicate negligence in placing the horse there, they may well call upon him to exercise greater care in managing the horse than would be required under other circumstances, and would naturally bear upon the question whether when he saw it was frightened and nervous, prancing, dancing, and shying, it was prudent to prevent it from removing on and forcing it to remain at the very spot where the exciting causes were. The care required to be exercised in any particular case depends upon all the circumstances making for safety or danger and the dangers to be apprehended. There was evidence, considered most favorably to the plaintiff, tending to show that the plaintiff was injured by the negligence of the defendant, and that his injury was not caused by an inevitable unforeseen accident for which there is no legal liability. At least the evidence was sufficient to require a submission to the jury of the question of the defendant's negligence.

Considered most favorably to the plaintiff the evidence presents the following situation: At Avon the Erie railroad tracks run north and south on either side of the passenger depot, and are about four rods from each other. Just west of the westerly track is a bus platform, for the use of passengers coming to or going from the station by conveyances, and there is a large open space there in Railroad avenue suitable for the placing and accommodation of teams coming to the station with or for passengers. About 30 feet north of the bus platform the milk road branches off from Railroad avenue and extends along the track westerly for a distance, and goes to the milk platform, which is about 120 feet north of the bus platform and near the railroad track. This road is not used for general travel, but for teams drawing milk to the station. The milk road goes along on a level, but Railroad avenue descends, so that the milk road at the milk platform is about 4½ feet higher than the street. The defendant was well acquainted with the locality, and knew the schedule time for the arrival and departure of trains. The Rochester train, the Buffalo train, and another train were due at the station at the same time, and were all nearly on time. Defendant came to the depot for a passenger expected to arrive on the Buffalo train, and had been there about 10 minutes, sitting in his buggy on the milk road at a place where it was about 12 feet wide extending from the westerly rail of the railroad. The nearest wheel of his wagon and the horse were within about 6 feet of said rail, and the milk road was here some 4 feet higher than the street, and is described as and called an embankment by some of the witnesses. The horse was facing south. At the time the defendant drove up the horse was "acting nervous, head up." A few minutes before the accident the Rochester train came from the south, on time, upon the track opposite the depot and the defendant, and some 70 feet from him. When the

train was some 4 or 5 rods away the horse seemed frightened and would not stand, and "was prancing before the train pulled in, and when it was pulling in, it never stopped." The defendant made no effort to drive away, although there was ample opportunity and the Buffalo train was then due. When the Buffalo train was approaching from the north from behind his horse, and some 200 or 300 feet away from the horse, "it pricked up its ears. * * * The noise scared it," but defendant paid no attention to it. When 75 or 100 feet away the horse turned and looked at the engine, which was blowing off steam. When the horse glanced around and "acted fierce," the defendant picked up the lines and spoke to it. It acted "as if it wanted to get out, stuck up its ears, and began to dance, and it was not but a second or so before the engine was by its side, and it made a plunge and started quickly and turned right around. It had a full swing to run right away from the engine if it had been allowed to go out. It turned around and turned the wagon bottom up. It kept shying off from the cars until it turned the wheel. It danced for about a minute before it tipped the defendant out, and while it danced and shied a little to the right apparently the wagon did not move. Defendant was holding it up. The horse began to dance and sheer to the west when the train was coming back of it. It was getting up a little spirit and began to put in considerable spirit when the train was about 10 feet this side of the milk platform. It had turned its head at this time, and then it began to prance more. I called it shying. It wanted to get out of there, but it could not start, because he held it. It was prancing, and it had started to shy to the right. I should think it shied 10 seconds before it got out of there. It did not shy very short on the start. It turned short about the time the engine passed." After the wagon tipped over, the defendant fell down the embankment, and the horse ran away and ran over the plaintiff.

There is also evidence tending to show that the defendant knew as follows about the horse: It sometimes shied at unexpected things. When he drove within 20 or 30 feet of trains it was often quiet, but sometimes frightened, and many times made trouble. It was frequently nervous at the cars—on Railroad avenue when they were 40 or 50 feet away. It was afraid of automobiles, especially if coming from behind. When meeting loads of furniture or baby carriages it was frightened and wanted to go faster, but was controlled. Defendant swears it first commenced to shy at loads of washing machines about three years ago. It was frightened at traction engines, but defendant could drive around one if the road was good and wide. Defendant had met threshing machines, but if they stopped he could go by. It never attempted to bolt or run. It would simply go to one side. Once it got excited with him between a shed and the cars, but he had no trouble in controlling it. It does not appear that she was used to the milk road or the nearness of the trains passing there. It does not appear that she was ever so near a moving train before, or nearer than about 20 feet. When defendant held her within 10 feet of a train "she made a good deal of a fuss."

When the horse was frightened at the Rochester train, there was ample opportunity for the defendant to get into a better place; but he

compelled it to remain there, knowing that another train was coming from behind him. When it was frightened at the Buffalo train, he could easily have passed ahead of the train to a safe place, if he had permitted the horse to move along as it was disposed to do; but he chose to compel the frightened animal to remain there, and sought purposely to overcome it, perhaps to accustom it to the situation. He may have been more intent upon holding it there, subduing and educating it, than he was for the safety of the public or of the plaintiff, whose position on the road and physical infirmities he well knew. Did the defendant act as a prudent man in placing this horse in that place and in keeping it there after it became frightened at the Rochester train, and also at the Buffalo train, when he had ample opportunity to get away from the exciting cause? These are questions to be answered by the inferences practical men would draw from the whole situation, and should be passed upon in the first instance by a jury.

The judgment and order are reversed, and a new trial granted, with costs to appellant to abide the event. All concur.